IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

MARJORIE R. NEZ, individually
and as the Personal Representative
of the Estate of MARY TSOSY,
Deceased

        Plaintiff,

      vs.                         No. 16-CV-0527-MV-KBM

THE UNITED STATES OF AMERICA

        Defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

**THIS MATTER** comes before the Court on Plaintiff's Memorandum of Law [Doc. 49], United States' Trial Brief [Doc. 50], Plaintiff's Requested Findings and Conclusions [Doc. 78], and Defendant's Requested Findings of Fact and Conclusions of Law [Doc. 81]. The Court, having considered the briefs, relevant law, trial testimony, exhibits, and being otherwise fully informed, finds that judgment must be entered in favor of Plaintiff and that Plaintiff is entitled to the relief requested, with the exception of damages for loss of consortium.

## FINDINGS OF FACT

The Court is familiar with the facts of this case from pretrial motion practice, a three-day bench trial, and the exhaustive set of exhibits submitted by the parties. Both parties have also submitted proposed findings of fact. *See generally* Docs. 78, 81. The Court has reviewed both sets of proposed facts and accepts some of these

facts, rejects some, and finds some facts that neither party brought to its attention.

Accordingly, the Court finds as follows:

## I.    Mary Tsosy's Background and Medical History

1.    Mary Tsosy was a Native American woman and a member of the Navajo Tribe. Trial Transcript ("Tr.") vol. 2, 24:23, July 10, 2018.  She was 87 years of age at the time of her death.  Pl. Ex. 4, Death Certificate of Mary Tsosy.  Marjorie Nez, Ms. Tsosy's daughter, is the personal representative of Ms. Tsosy's estate in this wrongful death action.  *Id*. at 4:12-13; Pl. Ex. 3, Order Appointing Personal Representative.

2.    Ms. Tsosy lived with Ms. Nez and her husband, Tom Nez, from 1998 until the date of her death, on November 8, 2013.  *Id*. at 110:14-16.

3.    Ms. Tsosy remained active during this time by cooking, washing dishes, making her bed, sewing her own clothes, weaving, taking walks, caring for her livestock, and spending time with her family.  *Id*. at 7:10-8:7, 11:9-21.  She loved cooking, including Navajo corn mush and tortillas, walking her dogs, going for walks with her family, and playing with and feeding her animals.  Tr. vol. 2, 110:23-111:12, 111:15-25.  In addition to these hobbies at home, Ms. Tsosy enjoyed traveling out of state to visit her relatives.  *Id*. at 113:17-24.

4.    Marjorie Nez and her mother, Mary Tsosy, shared a close familial relationship. They would hug each morning, and in the evenings they would lay on their beds in a room they shared, talking until they fell asleep.  *Id*. at 13:20-25.

5. Ms. Nez was Ms. Tsosy's caretaker, assisting her for approximately ten or 20 years prior to her death. *Id*. at 26:19-24; Pl.'s. Req.'d Findings and Conclusions, ¶ 21, 14, Aug. 24, 2018, ECF No. 78. She was responsible for administering her mother's prescribed medications, including Warfarin, the anticoagulation medication that is at the center of this dispute. *Id*. at 7:10-21, 8:9-19, 26:22-24, 27:2-28:16. Ms. Tsosy relied upon Ms. Nez to tell her which medications to take, and Ms. Nez would observe Ms. Tsosy take her medications to ensure that she was in fact taking them. *Id*. at 27:25-28:13.

6. Ms. Nez also assisted with Ms. Tsosy's bathing (helping so that Ms. Tsosy did not slip in the bathtub), hygiene (including cleaning her dentures and applying eye drops), and taking her to medical appointments. *Id*. at 8:8-19, 27:3-16, 28:14-24, 13:20-23. Because Ms. Tsosy was monolingual, Ms. Nez was responsible for translating and providing important information at Ms. Tsosy's medical appointments. Tr. vol. 1, 235:4-25, July 9, 2018. Ms. Nez received care instructions for Ms. Tsosy at these appointments. Tr. vol. 2, 28:14-24.

7. Ms. Nez was paid by an organization called Ambercare to take care of her mother. *Id*. at 5:24-6:5; 27:21-24.

8. Ms. Nez testified at trial that she enjoyed taking care of her mother. *Id*. at 14:1-2.

## II. March 28, 2013 Hospitalization at Lovelace Heart Hospital

9. On March 28, 2013, Ms. Tsosy was hospitalized at Lovelace Heart Hospital with symptoms of chest pain, shortness of breath, and palpitations. Ms. Tsosy was

treated for atrial fibrillation and placed on heart medications and the anticoagulation medication, Warfarin (also referred to as Coumadin) by cardiologist, Mel Peralta, M.D.  Pl. Ex. 6 at 5-15; Tr. vol 1, 216:16-18.

10. After her discharge from Lovelace Heart Hospital, Ms. Tsosy followed up with the Crownpoint anticoagulation clinic as instructed by Dr. Peralta.  Pl. Ex. 6 at 15; Def. Ex. H.  Ms. Tsosy attended 13 appointments at the Crownpoint anticoagulation clinic between April and October of 2013.  At these appointments, her anticoagulation medication was monitored and adjustments were made by the pharmacy physician in order to maintain Ms. Tsosy's International Normalization Ratios ("INRs") within a therapeutic range.  Pl. Ex. 6 at 15.

11. The INR is a ratio used for patients taking anticoagulants to measure how thin the patient's blood is, and whether the patient is compliant with his or her anticoagulation medication.  Tr. vol. 1, 68:19-21.  It measures how quickly the patient's blood clots.  A higher INR value translates to thinner blood and a lower likelihood of blood clotting whereas a lower number translates to a higher likelihood of clotting.  *Id*. at 7:19-25.  The therapeutic range for patients like Ms. Tsosy with atrial fibrillation is between 2.0 and 3.0.  *Id*. at 8:1-2.

12. Ms. Tsosy was not taken off Warfarin during any of these visits to the Crownpoint anticoagulation clinic despite INR values that were, at times, either sub-therapeutic (below 2.0) or supra-therapeutic (above 3.0).  There is no documentation of any discussion about removing her from the medication, nor

4

is there documentation of any concern that the risks of taking Warfarin outweighed the benefits of Warfarin. Pl. Ex. 6 at 15; Def. Ex. H; Tr. vol. 2, 108:6-9. Ms. Tsosy was seen by three separate specialists during this time, including two cardiologists, all of whom kept her on Warfarin. Tr. vol. 1, 213:8-9, 216:16-25, 217:10-13.

13. Lorenzo Nava, R.N., Ph.D., became Ms. Tsosy's primary care provider beginning on April 15, 2013. Tr. vol. 2, 80:6-15. Dr. Nava based his notes and understanding of Ms. Tsosy's medical history, lifestyle information, and medication compliance on information he received from her. *Id*. at 64:1-5, 68:22-69:2, 74:7-13, 88:16-89:25, 93:12-18. Over the course of his care of Ms. Tsosy, he assisted in treatment for her congestive heart failure, atrial fibrillation, diabetes, high blood pressure, high cholesterol, and osteoporosis. *Id*. at 80:23-83:2, 86:4-9, 96:14-17; Def. Ex. A; Def. Ex. A-1.

14. Dr. Nava testified that Ms. Tsosy was compliant in following up with her primary care provider, and that, to his knowledge, she was compliant with taking her Warfarin. Tr. vol. 2, 73:10-18.

15. On July 16, 2013, Ms. Tsosy's hemoglobin A1C level was quite high, indicating to Dr. Nava that her blood sugar had been elevated for a period of at least three months. He testified that this could have increased her risk of possible negative outcomes, including an increased risk of fall and uncontrolled bleed. *Id*. at 86:1-88:4. He also testified that it was a challenge to keep Ms. Tsosy's hemoglobin and glucose levels properly adjusted, and that her elevated A1C

levels and sub-therapeutic INR readings could have been due to a lack of compliance with medications. *Id*. at 88:16-21, 90:1-4, 94:1-4; Def. Ex. A; Def. Ex. A-1.

16. However, between August and September of 2013, because he considered her blood sugars to be more stable, he changed the frequency of Ms. Tsosy's visits from every two weeks to once a month. Tr. vol. 2, 102:25-103:16. Ms. Tsosy was also considered stable on her Warfarin at that time. *Id*. at 77:16-22; Pl. Ex. 5 at 16.

17. On her last visit with Dr. Nava on September 20, 2013, he changed the frequency of her visits from once a month to once every three months because her blood sugar had shown significant improvement and because she was stable on Warfarin since her INR ratios were in the therapeutic range for three visits in a row.[1] Tr. vol. 2, 98:18-25, 104:1-13.

18. Between April and September of 2013, Ms. Tsosy attended appointments with Dr. Nava on a regular basis to follow up on her diabetes and atrial fibrillation. She was not taken off Warfarin during this time, nor was there any discussion about removing her from Warfarin, or documentation of any concern that the risks of taking Warfarin outweighed the benefits. Pl. Ex. 5 at 16-17, 18-21, 22-24, 31, 34, 37, 42, 45-51, 58, 62-67; Def. Ex. A-1; Def. Ex. G; Tr. vol. 2, 108:6-10. Dr. Nava testified that at no time during his visits with Ms. Tsosy did he have any reason to recommend that she discontinue Warfarin. *Id*. at 108:6-10.

---

[1] *See* Def. Ex. A-1 at 16 (INR of 2.0 on September 20, 2.6 on August 15, and 2.2 on July 29).

### III.    August 6, 2013 Fall and Visit to Crownpoint Emergency Department.

19. On August 6, 2013, Ms. Tsosy was seen at Crownpoint Emergency Department after falling and hitting her knee.  Although there was a small amount of bruising and swelling observed around her left knee, she was not taken off Warfarin, and there was no discussion of concern about bleeding in her knee. There was no discussion of removing her from Warfarin, and no documentation of any concern by the emergency room physician that the risks of taking Warfarin outweighed the benefits.  Pl. Ex. 5 at 18-21; Tr. vol. 1, 86:21-87:3, 89:18-21.  The medical records from that date reflect outpatient directions to take one tablet of Warfarin daily, six days a week.  Pl. Ex. 5 at 18-19.

### IV.    October 29, 2013 Hospitalization at Crownpoint Healthcare Facility

20. On October 29, 2013, Ms. Tsosy presented to Crownpoint Healthcare Facility with complaints of shallow breath.  Def. Ex. A; Pl. Ex. 5 at 6.  Medical records from that visit indicate that she presented with multiple co-morbidities, including diabetes, dyslipidemia, atrial fibrillation, congestive heart failure, and high blood pressure.  Def. Ex. A at 243; Tr. vol. 1, 33:11-18, 188:10-21, 189:1-14. Her atrial fibrillation was still being managed with Warfarin.  Pl. Ex. 5 at 6-10.

21. On October 29 and 30, 2013, Ms. Tsosy came under the care of physician Dr. Erin Nealon, D.O.  Tr. vol. 1, 22:1-3.  At this time, Dr. Nealon was an employee of the Defendant, United States, and acting within the scope and course of her employment.  Tr. vol. 1, 21:8-22:13.

22. During her initial assessment, Dr. Nealon reviewed Ms. Tsosy's chart, notes, labs, and medications. Def. Ex. A at 243. She then reviewed Ms. Tsosy's symptoms and determined that Ms. Tsosy had uncontrolled atrial fibrillation, uncontrolled diabetes, and congestive heart failure. Ms. Tsosy's INR ratio was also sub-therapeutic. Def. Ex. A at 6, 239-40; Tr. vol. 1, 68:19-23, 188:16-19. In her evaluation, Dr. Nealon obtained an extensive history, relying on medical assistants and family members (primarily Ms. Nez) who were bilingual. Tr. vol. 1, 190:15-25, 191:1-6, 235:12-25.

23. Dr. Nealon testified that the INR values were the first thing she referred to in Ms. Tsosy's case, in addition to considering issues of compliance around diabetes control which, Dr. Nealon stated had shifted in the months prior to their first visit. Tr. vol. 1, 68:19-25.

24. It was noted that Ms. Tsosy was still able to get around the house and "ambulate without falls," and that although she had a decline in exertional capacity over the previous year, she had no major changes to her mental status. Pl. Ex. 5 at 243; Def. Ex. A at 239, 243; Tr. vol. 1, 38:9-17, 188:11-21.

25. Dr. Nealon learned that Ms. Tsosy had uncontrolled diabetes such that her hemoglobin A1C level had risen significantly, which was potentially indicative of non-compliance. *Id*. at 68:23-25, 69:1-5, 195:17-23. She was also aware that Ms. Tsosy took Warfarin for anticoagulation at the time she was admitted to the hospital, but at that time she was sub-therapeutic with an INR of 1.44. Def. Ex. A at 6, 246; Tr. vol. 1, 191:7-15. This low INR value could have been indicative

of non-compliance or of a problem with the patient's diet. *Id*. at 80:7-18, 195:24-25, 196:1-7.

26. Dr. Nealon was in charge of assessing Ms. Tsosy's overall risk based on all of her factors. Based on Ms. Tsosy's condition, Dr. Nealon determined that she was at a high risk for stroke and a high risk for bleed given her functional status. *Id*. at 40:15-20.

27. The CHADS2-Vasc calculator measures the risk of stroke per year for patients based on certain risk factors. Each factor adds points based on conditions, including age over 75 years, gender, congestive heart failure or hypertension, prior stroke, coronary artery disease, or diabetes. Tr. vol. 3, 30:5-9, 31:2-11, July 11, 2018. Dr. Nealon calculated Ms. Tsosy's CHADS2-Vasc score to be six out of 10 possible points. Tr. vol. 1, 59:14-17; *see* Pl. Ex. 14. Any score greater than or equal to three is considered a high risk for ischemic stroke.[2] *See* Def. Ex. C.

28. The HAS-BLED calculator tabulates certain risk factors to calculate the risk of bleeding. The relevant factors include hypertension, liver disease, prior stroke, bleeding disorder or predisposition, labile INRs,[3] and age over 75 or 80 years. Tr. vol. 3, 32:12-25, 33:1-14; Def. Ex. D.

29. Dr. Nealon testified that she evaluated Ms. Tsosy based on the CHADS2-Vasc score, HAS-BLED score, and using her own clinical judgment. She determined that the bleeding risk was of more concern to her than the stroke risk. Tr. vol. 1,

---

[2] An ischemic stroke is caused by a blood clot that stops blood from flowing to the brain. Tr. vol. 1, 6:25-7:3.
[3] Labile INRs are INR values that are not in the therapeutic range enough of the time. They are either too high (supra-therapeutic) or too low (sub-therapeutic). Tr. Vol. III, 33:9—11.

205:22-25.  In reaching this decision, Dr. Nealon also factored in Ms. Tsosy's fall risk in relation to the bleeding risk.  In doing so, she relied on the admitting nurse's "Morse Fall Risk Scale" calculation in the medical chart, which takes into account a patient's history of falls, use of canes or crutches, use of IV medications in the hospital, gait and transfer issues, and weakness.  The admitting nurse had calculated a score of 60, which is a high fall risk.  *Id*. at 196:25, 197:1-25, 198:1-11; Def. Ex. A at 196, 264.

30. Dr. Nealon additionally testified that she observed that Ms. Tsosy required "touch assist" in the hospital in order to walk around, and that she was transferred to a wheelchair when she went for x-rays.  Tr. vol. 1, 229:9-22, 230:5-12.  She stated that it is part of her "standard of practice" to watch every patient get up and walk, and that typically, she would observe the patient performing at different levels including sitting and talking, standing, and transferring.  *Id*. at 229:9-16, 230:17-22.  During her testimony, Dr. Nealon frequently spoke in generalities about her standards of practice, rather than specific interactions with Ms. Tsosy.  *See e.g. Id*. at 49:22-25, 229:9-16, 230:17-22.  It was upon being questioned by the Court about this specific patient and this particular case that Dr. Nealon testified that she recalled watching Ms. Tsosy move from the bed to the chair and then to the x-ray machine and observing her ability to walk prior to discharge.  *Id*. at 230:23-231:16.  Dr. Nealon conceded that she did not document in the medical records any of her observations with respect to Ms. Tsosy's ability to walk.  *Id*. at 230:13-16.  The records indicated that Ms. Tsosy

was a fall risk at home and wandered on her own at times, but contained no observations by Dr. Nealon. Pl. Ex. 5 at 240.

31. Dr. Nealon testified that, based on these evaluations and the information she learned from Ms. Tsosy's family, she was concerned about keeping Ms. Tsosy on Warfarin due to her fall risk and corresponding bleed risk, as well as possible non-compliance with the medication. She also testified that she was concerned, based on the functional assessment, about Ms. Tsosy's overall status, dependency, and ability to perform daily tasks. Tr. vol. 1, 200:5-21, 202:2-14. Based on the lab values, she also found that Ms. Tsosy was not therapeutic with respect to her medications for diabetes, heart rate, blood pressure, or INR values. *Id*. at 203:1-7.

32. Dr. Nealon noted in her "Assessment and Plan" that she wanted to "discuss with family stopping Coumadin," noting that Ms. Tsosy was sub-therapeutic and of questionable compliance, with her "age-fall risk" outweighing the benefits of the medication. *Id*. at 91:19-25, 92:1-2; Def. Ex. A at 202.

33. Dr. Nealon testified that she had a "risk-to-benefit ratio conversation" in which she would have indicated to the family that "if [Ms. Tsosy] stopped Coumadin or if we decide to do that," then Ms. Tsosy would be at a high risk for stroke. Tr. vol. 1, 234:3-19. Plaintiff, however, disputes that such conversation ever took place. Tr. vol. 2, 20:13-18.

34. According to Ms. Nez, Dr. Nealon never informed her or Ms. Tsosy of her mother's high risk for blood clots or stroke if the Warfarin anticoagulation therapy was discontinued. *Id*. at 20:13-18.

35. Dr. Nealon did not include in her notes in the medical records any specific reference to a discussion with Ms. Nez or Ms. Tsosy regarding Ms. Tsosy's bleed risk or stroke risk. Tr. vol. 1, 45:2-46:21. She did not specify any discussion of advising Ms. Tsosy to discontinue Warfarin because she was a bleed risk, nor did she specify a conversation regarding Ms. Tsosy's high risk of stroke if she discontinued Warfarin. *Id*. at 45:8-46:9, 46:10-21; Pl. Ex. 5 at 240.

36. Ms. Nez testified that Dr. Nealon spoke to her only one time and spent just a few minutes discussing her mother's healthcare with her. Tr. vol. 2, 21:6-10.

37. On October 30, 2013, Dr. Nealon took Ms. Tsosy off Warfarin. Pl. Ex. 5 at 211. At that time, she had approximately a 36-hour history with Ms. Tsosy. Tr. vol. 1, 128:6-11. Dr. Nealon instructed Ms. Tsosy to start taking a daily dose of aspirin for her uncontrolled diabetes, congestive heart failure, hypertension, and dyslipidemia, all of which Dr. Nealon described as independent risk factors for stroke. She testified that aspirin is an important part of treatment strategies for patients over 65 years of age. However, Ms. Tsosy had already been prescribed a daily dose of aspirin, as instructed by her cardiologist several months prior. *Id*. at 43:20-25, 64:20-65:4. Dr. Nealon also testified that she believed Ms. Tsosy had a high risk of bleeding so she did not want to treat her with "excessive anticoagulation." *Id*. at 65:10-17.

38. Dr. Nealon testified that Ms. Tsosy had multiple high-risk factors for stroke, including atrial fibrillation, diabetes, age, hypertension, and congestive heart failure. *Id*. at 26:8-27, 39:16-24. Despite this, Dr. Nealon did not consult or attempt to consult Ms. Tsosy's primary care physician or cardiologists before making the decision to remove her from the medication that they had all previously ordered. *Id*. at 65:5-9. Further, Dr. Nealon did not obtain a cardiology consult by telephone at Crownpoint Healthcare Facility prior to discontinuing Ms. Tsosy's anticoagulation therapy. *Id*. at 53:20-54:4.

39. On the day Dr. Nealon removed Ms. Tsosy from her anticoagulation medication, Ms. Tsosy was at a high risk for stroke. *Id*. at 116:13-21, 39:16-24. This high risk was due to her atrial fibrillation. *Id*. at 106:13-20.

40. Prior to October 29, 2013, Ms. Tsosy had taken Warfarin for anticoagulation without complication. *Id*. at 109:5-21. Nevertheless, Dr. Nealon discharged Ms. Tsosy home from the hospital without a plan for managing her anticoagulation levels for her atrial fibrillation, other than a daily dose of aspirin. *Id*. at 67:12-18; Pl. Ex. 5 at 211. Still, there were alternative medications, other than Warfarin, that Dr. Nealon could have considered for Ms. Tsosy. Tr. vol. 1, 117:17-118:4. Dr. Nealon testified that anticoagulation therapy is one way to manage the risk of stroke for patients with atrial fibrillation. *Id*. at 28:12-19.

41. Ultimately, in her evaluation, Dr. Nealon determined Ms. Tsosy's bleed risk to be higher than her stroke risk. She testified that her decision to stop the Warfarin was not "black and white," and that her decision was based on Ms.

Tsosy's medical history, functional status, the decline she was experiencing, her fall risk, the risk-to-benefit ratio including medication compliance, control of disease, and Dr. Nealon's own clinical judgment. *Id*. at 63:18-64:10. She also based her recommendation on Ms. Tsosy's long-standing dyslipidemia, uncontrolled diabetes, and long-standing hypertension. *Id*. at 209:8-25.

42. On October 30, 2013, prior to her discharge from the hospital, Ms. Tsosy was diuresed (excess fluid levels removed). At that time, her heart rate was normalized and her blood pressure had improved. *Id*. at 204:1-16. Based on her evaluation, Dr. Nealon discharged Ms. Tsosy without Warfarin and continued her on aspirin. She testified that she discharged Ms. Tsosy without a specific anticoagulation drug for atrial fibrillation, but with other medications to reduce her risk of stroke. She testified that Ms. Tsosy had a high risk of stroke due to her chronic long-standing hypertension that was not always controlled, as well as her uncontrolled diabetes, uncontrolled congestive heart failure and left ventricular failure. *Id*. at 66:10-67:1. Dr. Nealon testified that she mitigated the risk of stroke with a statin lipid-lowering drug for her atrial fibrillation and dyslipidemia. *Id*. at 67:2-7.

43. On October 30, 2013, Ms. Nez received and signed the discharge instructions from Dr. Nealon in which Dr. Nealon ordered "stop Warfarin, start low dose aspirin for blood thinning." Pl. Ex. 5 at 211; Def. Ex. A; Tr. vol. 2, 40:3-9. Pursuant to Dr. Nealon's instructions, Ms. Nez stopped giving Ms. Tsosy Warfarin. *Id*. at 21:3-5.

44. The nursing notes from Crownpoint Healthcare Facility on that date indicated that, although Ms. Tsosy was taken to x-ray in a wheelchair, she was able to walk with minimal assistance back from x-ray and later to the vehicle when she was discharged. Pl. Ex. 5 at 199-200, 243. These notes are not consistent with the observations that Dr. Nealon testified she made regarding Ms. Tsosy's ability to walk, but that she failed to record in her notes. Furthermore, Dr. Nealon was not able to describe what Ms. Tsosy looked like, nor could she describe the patient she saw immediately before or after her, Ms. Nez, or Ms. Tsosy's grandson with any specificity. Tr. vol. 1, 48:15-49:25.

45. The Court finds that Dr. Nealon's memory of her interactions with Ms. Tsosy and her family are dubious, and accordingly does not find credible Dr. Nealon's testimony as to her observations of Ms. Tsosy's ability to walk or her conversation with the family regarding risks and benefits of stopping Warfarin.

## V. November 5, 2013 Hospitalization at Rehoboth McKinley Christian Hospital

46. Ms. Nez took her mother to Rehoboth McKinley Christian Hospital when her condition worsened because Dr. Nealon had discontinued the Warfarin at Crownpoint, and she felt that "Rehoboth would be a better hospital." Tr. vol. 2, 47:6-21. When they arrived, Ms. Tsosy was in pain but she walked in on her own and was admitted to the emergency room. The doctors informed Ms. Nez that Ms. Tsosy would have to stay at the hospital to have some testing done. *Id.* at 48:5-24.

47. Records indicate that Ms. Tsosy presented to Rehoboth on November 5, 2013 with acute respiratory failure, congestive heart failure, and atrial fibrillation with rapid ventricular rate.  Pl. Ex. 7 at 4.

48. On or about the late hours of November 6, 2013, or the early morning of November 7, 2013, Ms. Tsosy suffered a stroke while in Rehoboth Hospital.  *Id.* As a result of her stroke, Ms. Tsosy was unable to speak and could not open her eyes.  Her health continued to deteriorate.  *Id.*; Tr. vol. 2, 23:8-24:13

49. On November 8, 2013, Ms. Tsosy died from a cardiopulmonary arrest, cerebral vascular accident, atrial fibrillation, and hypertension.  Pl. Ex. 4.

## VI.  Experts

### i.  Plaintiff's Expert, Jeffery A. Breall, M.D., PhD

50. Dr. Jeffrey A. Breall, M.D., PhD was qualified to testify as an expert in this case in the areas of cardiology, internal medicine, and diagnosis, treatment, and management of patients with atrial fibrillation.  Tr. vol. 1, 103:3-6.

51. Dr. Breall testified that had Dr. Nealon met the standard of care[4] as Ms. Tsosy's physician, Ms. Tsosy would still be alive today.  *Id.* at 127:15-22.  Removing Ms. Tsosy from her anticoagulation medication without ensuring that she maintained proper anticoagulation was below the standard of care and caused

---

[4] The "standard of care" that applies to a physician treating a patient is the care provided to a patient by a physician of the same or similar specialty in the same or similar geographic location.  It is what other physicians faced with the management of a similar patient would do in the same area under the same circumstances.  With respect to diagnosis and patient management, this may require taking into account the rural location and the socioeconomic status of an area.  Tr. vol. 3, 24:12-25.

her to suffer the complication of a stroke, which caused her premature death.  *Id.*
at 106:7-107:12, 124:3-6, 125:10-15, 126:9-127:15, 169:4-20.

52. There were several bases for Dr. Breall's opinion that Dr. Nealon's treatment of
Ms. Tsosy fell below the standard of care.  He testified that Dr. Nealon's failure
to consult Ms. Tsosy's treating physician prior to her decision to discontinue
Warfarin was a "deviation" from the standard of care.  *Id.* at 128:7-15, 150:11-15.
He did not state that this was a violation of the standard of care, but noted that
it would have been "prudent" to consult other physicians about Ms. Tsosy.  *Id.* at
150:11-15.

53. Dr. Breall testified that it was a departure from the standard of care for Dr.
Nealon to discontinue Warfarin in Ms. Tsosy on the basis that Ms. Tsosy's INR
was sub-therapeutic.  *Id.* at 123:24-124:2.  He also believed that it was a
departure from the standard of care for Dr. Nealon to discontinue Warfarin in
Ms. Tsosy on the basis that she was a fall risk.  *Id.* at 124:3-6.  However, when
he found out that Dr. Nealon had ordered a dose of Warfarin on October 29,
2013, he withdrew his opinion that she completely failed to provide
anticoagulation medication.  *Id.* at 139:16-24, 140:14-16.

54. Dr. Breall also testified that Dr. Nealon fell below the standard of care with
respect to her communication with the patient and her documentation in the
medical records.  He testified that Dr. Nealon's failure to advise Ms. Tsosy and
Ms. Nez of Ms. Tsosy's risk of stroke if she discontinued Warfarin was below the
standard of care.  *Id.* at 110:14-16.  He also testified that Dr. Nealon's failure to

document that she allegedly advised Ms. Tsosy and Ms. Nez of Ms. Tsosy's risk of stroke if she discontinued Warfarin was below the standard of care. *Id.* at 115:18-116:9, 117:6-16. While Dr. Breall did acknowledge that Dr. Nealon documented the fact that she had a discussion with Ms. Tsosy and the family about the risks versus benefits of stopping Warfarin, the medical records only refer to a discussion of risks versus benefits of stopping the medication with respect to her atrial fibrillation, but make no mention of a risk of stroke without Warfarin. *Id.* at 146:13-17; Pl. Ex. 5 at 240.

55. Dr. Breall testified that aspirin as monotherapy for patients like Ms. Tsosy is ineffective for preventing clots and subsequent stroke. Tr. vol. 1, 119:8-18. Furthermore, Dr. Breall testified that substituting aspirin for Warfarin was irrational because "aspirin is absolutely not protective whatsoever." *Id.* at 118:10-12. Dr. Nealon, in her testimony, agreed that according to the literature, aspirin used by itself in patients with atrial fibrillation is not effective at preventing strokes. *Id.* at 65:5-9. According to Dr. Breall, Ms. Tsosy's stoke and death were a direct and proximate result of Dr. Nealon's negligence with respect to Warfarin. *Id.* at 106:7-107:12, 125:10-15, 126:9-127:15. Dr. Breall believes that the ischemic stroke that Ms. Tsosy suffered was a result of having been removed from the anticoagulation medication Warfarin. *Id.* at 125:10-15, 126:9-127:15, 169:4-20.

56. While Dr. Breall faulted both Crownpoint and Rehoboth for what happened to Ms. Tsosy, he stated that "the majority of the culpability here is with

Crownpoint," and that if Crownpoint had "just continued her on the Warfarin, this wouldn't have been an issue." *Id*. at 164:9-11. He further testified that Crownpoint, and specifically Dr. Nealon, "made a gross error in stopping Warfarin anticoagulation," that they "confused the family," and that they "confused the subsequent healthcare providers." *Id*. at 164:15-21.

### ii. Defendant's Expert, Neal Shadoff, M.D.

57. Dr. Neal Shadoff, M.D., a cardiologist in Albuquerque, was qualified to testify as an expert in the field of cardiovascular disease. Tr. vol. 3, 20:17-22.

58. As to the standard of care for a patient with atrial fibrillation like Ms. Tsosy, Dr. Shadoff defined it as "utilizing treatment strategies to control heart rate and to prevent blood clots when feasible," while also recognizing the bleeding potential. *Id*. at 26:6-11. He also noted that the national guidelines for the standard of care require a shared decision with the patient and family, rather than the physician making the decision to do something to a patient. *Id*. at 26:6-11.

59. Dr. Shadoff utilizes as a "template" the guidelines for the standard of care that are promulgated by the American College of Cardiology, the American Heart Association, and the American College of Chest physicians, in conjunction with the specific circumstances of the individual patient. *Id*. at 26:18-25.

60. He believes that the 2006 American College of Cardiology Guidelines are a useful tool for doctors to utilize in diagnosing and treating patients, although they should be treated as a template for individualized care, rather than creating a bright-line rule. *Id*. at 120:10-22. These guidelines divide patients

into low, intermediate, or high risk for blood clots, and then either low or some

risk for bleeding. *Id*. at 7-10. He agreed, based on her risk factors, including

age, female, heart failure, hypertension, and diabetes, that those guidelines

required Ms. Tsosy to be on Warfarin, "in the absence of a contradiction." *Id*. at

73:1, 88:19-23, 89:2-13. Nonetheless, he stated that he believes Dr. Nealon's

treatment of Ms. Tsosy was reasonable based on Ms. Tsosy's condition, taking

into account the published guidelines and literature. *Id*. at 121:5-9.

61. Dr. Shadoff agreed that Dr. Nealon's failure to inform Ms. Tsosy of her high risk

of stroke and the high risk of bleeding would be below the standard of care. *Id*.

at 115:25-116:4. However, Dr. Shadoff testified that Dr. Nealon spoke to Ms.

Tsosy and her family regarding the risk of stroke associated with stopping

Warfarin. *Id*. at 60:7-9. Dr. Shadoff also testified that it was appropriate for Dr.

Nealon to meet with Ms. Tsosy and Ms. Nez to discuss stopping Warfarin,

because that type of medical recommendation must be a shared decision that the

physician cannot make for the patient. It is up to the patient to "decide to follow

your recommendation or not." *Id*. at 59:24-60:6.

62. Despite Dr. Shadoff's testimony, the records indicate only that Dr. Nealon

discussed the risks and benefits associated with stopping Warfarin. There is no

indication that she discussed with Ms. Tsosy or Ms. Nez that there was a stroke

risk specifically. *Id*. at 60:7-9; Pl. Ex. 5 at 240.

63. Dr. Shadoff testified that during the period in 2013 when Ms. Tsosy was

hospitalized at Crownpoint hospital, she was at a risk of stroke due to her

hypertension, diabetes, hyperlipidemia, and atrial fibrillation. Atrial fibrillation carries "the associated issue of stroke" about 25% of the time, while hypertension, diabetes, and hyperlipidemia are also associated with a risk of stroke. *Id*. at 22:21-25, 23:1-6. Dr. Shadoff agreed with Dr. Breall that Ms. Tsosy's atrial fibrillation created a high risk for stroke, but also noted that she had other risk factors. *Id*. at 62:1-6 78:9-18.

64. Based on his review of Ms. Tsosy's records and his assessment of her risks using certain "calculators," Dr. Shadoff opined that Ms. Tsosy's risk of bleeding was higher than the risk of forming a blood clot and suffering a stroke, and therefore that Dr. Nealon's decision to discontinue Ms. Tsosy's Warfarin regimen was appropriate. *Id*. at 34:1-13. Dr. Shadoff supported Dr. Nealon's recommendation to stop Warfarin and continue aspirin alone for Ms. Tsosy. *Id*. at 61:8-13, 85:22-25, 86:1-7. On the other hand, he agreed with the statement that "anticoagulants unequivocally reduce the risk of stroke in patients with atrial fibrillation." *Id*. at 79:10-12. He also agreed that it was appropriate for Crownpoint to keep Ms. Tsosy on Warfarin even after her fall in August. *Id*. at 78:9-18.

## VII. Risk Factor Calculations and Disputed Factual Issues

65. At trial, both experts discussed several "risk calculators" on which they based some of their testimony. *Id*. at 28:24-29:4. Tr. vol. 1, 134:9-11. Each expert interpreted the results of these calculators and risk factors differently.

66. First, there are the CHADS2-Vasc and HAS-BLED calculators. As previously noted, the CHADS2-Vasc calculator measures the risk of stroke per year for patients with specified risk factors. Points are added for each relevant factor including age over 75 years, gender, congestive heart failure or hypertension, prior stroke, coronary artery disease, or diabetes. Tr. vol. 3, 30:5-9, 31:2-11. The HAS-BLED calculator accounts for various risk factors to calculate the risk of bleeding, including hypertension, liver disease, prior stroke, bleeding disorder or disposition, labile INRs, and age over 75 or 80 years. *Id*. at 32:12-33:14.

67. Dr. Shadoff testified that he regularly uses both of these calculators in his medical practice, and relied upon them heavily in explaining the basis of his opinions during trial. *Id*. at 30:5-9, 33:20-22.

68. Dr. Shadoff calculated that Ms. Tsosy had a 9.8% average yearly risk of clotting using CHADS2-Vasc, and a 12.5% yearly risk of a major serious bleed using HAS-BLED. *Id*. at 39:16-22. Based on this information, Dr. Shadoff testified that Dr. Nealon followed the appropriate standard of care in making her treatment decision because she evaluated the stroke risk versus the bleeding risk. *Id*. at 56:17-21.

69. However, Dr. Breall reached a different conclusion. He declined to assess a point for labile INR values because Ms. Tsosy had only been on Warfarin for what he described as a short time frame, and noted that it is to be expected that INR ratios will fall outside of the therapeutic range when a patient has just

started the medication.  Tr. vol. 1, 155:11-18, 157:3-9.  Under his calculations,

Ms. Tsosy's "stroke risk is tenfold higher than her bleeding risk."  *Id*. at 123:7-8.

70. Moreover, because the HAS-BLED score takes into account all different types of

bleeding, both fatal and near fatal, as well as bleeding that is not fatal or near

fatal, he did not believe HAS-BLED to be an appropriate point of comparison for

scoring criteria for a stroke risk in patients with atrial fibrillation on Warfarin.

Instead, he stated that it should be used as an "overall guide" to a patient's

potential for bleeding rather than to determine whether someone's bleeding risk

outweighs their stroke risk.  Furthermore, he pointed out that the HAS-BLED

score did not come up in the medical records, and was only used as a point of

discussion after the fact, during the trial testimony.  *Id*. at 122:19-123:7.

71. The Court notes that although Dr. Nealon testified that she considered the HAS-

Bled calculation, she did not mention a specific calculation or how she arrived at

any number as she did with the CHADS2-Vasc score.  *See id*. at 205.

72. At trial, Plaintiff's counsel asked Dr. Nealon about an article from UpToDate by

Dr. Warren J. Manning, entitled "Atrial Fibrillation: Anticoagulation therapy to

prevent embolization."  The article stated that tools used to assess bleeding risk

in patients taking oral anticoagulants, including the HAS-BLED bleeding risk

score, lead to imprecise estimates in individual patients.  When pointed to this

assertion in the article, Dr. Nealon testified that she had no reason to disagree

with that conclusion, other than the fact that she uses a "multifactorial

approach" and that HAS-BLED is not the only tool she would use.  She testified

that she would not base her recommendation on any one calculator over another. *Id*. at 61:25-62:13.

73. In that study, the authors also stated that for CHAD-Vasc scores greater than or equal to two, they would make a "strong recommendation for oral anticoagulation." According to Plaintiff's counsel, the article stated that "[a]ll studies have concluded that the benefit from anticoagulation significantly exceeds the risk for almost all [atrial fibrillation] patients with a CHAD-Vasc score of two or greater." Dr. Nealon also did not disagree with that conclusion, but stated that she also relied on clinical judgment. *Id*. at 58:19-59:20. Dr. Nealon testified that Ms. Tsosy's CHAD-Vasc score would have been six, which is encompassed within the study's "strong recommendation for oral anticoagulation" for scores of two or greater. *Id*. at 58:19-59:2, 59:14-20.

74. Second, the experts discussed INR values in their opinions. Dr. Shadoff testified that if a patient's INR values are not in the therapeutic range at least 60 percent of the time, the risk for both blood clots and bleeding is increased. Tr. vol. 3, 33:11-14. It was his belief that Dr. Nealon's decision to remove Ms. Tsosy from her anti-coagulation medication was appropriate because of the lability (variability) in her INR values, and because, under his calculations summarizing the INR values in Ms. Tsosy's medical chart, she was not in therapeutic range more than 60% of the time. He believed that her bleeding risk was dependent on the lability of her INR values. *Id*. at 35:8-16, 38:24-39:10.

75. Dr. Breall opined that it is unacceptable to discontinue Warfarin on the basis of a patient's sub-therapeutic INR values. Tr. vol. 1, 123:24-124:2. Dr. Breall testified that it is normal for patients on Warfarin to have values that drop into the sub-therapeutic range and disputed that the cutoff of 60% should apply here due to the relatively short period of Ms. Tsosy's use of the medication. *Id.* at 155:11-18. He argued that rather than taking those patients off the life-saving medication, the appropriate course of action is for the physician to adjust the medication dosage, and try to the best of her ability as the treating physician to bring those patients into the therapeutic range. *Id.* at 123:12-16. This strategy was also confirmed the testimony of Dr. Nava, Ms. Tsosy's primary care provider, regarding the pharmacists at the anticoagulation clinic who would adjust the dose of medication upward or downward based on the INR reading in order to achieve an INR within the therapeutic range. Tr. vol, 2, 65:10-21.

76. The medical records from Crownpoint also reflect this practice of adjusting the medication dosage to attempt to correct the INR values and keep them within the therapeutic range. For example, during a visit on May 2, 2013, Ms. Tsosy's INR was 3.6 while on 14 milligrams of Warfarin per week. The assessment stated that the INR was supra-therapeutic, and the records noted a plan to decrease the Warfarin dose by 7.1% per week from 14 milligrams to 13 milligrams per week. Pl. Ex. 5 at 48. On May 31, 2013, Ms. Tsosy's INR was 1.5 while on 13 milligrams per week. Because this value was sub-therapeutic, the plan was to increase the dosage back up to 14 milligrams per week, taking 2

milligrams daily. *Id.* at 44-45. On July 9, 2017, Ms. Tsosy's INR was 3.3 while on 14 milligrams of Warfarin per week. Because this INR was supra-therapeutic, the plan was to decrease the Warfarin dosage to 13 milligrams per week. *Id.* at 42-43. On September 20, 2013, Ms. Tsosy's INR was 2.0 on 13.5 mg of Warfarin per week. Because this INR was therapeutic, no adjustments were made and the plan was to continue the same dosage of 13.5 milligrams per week of Warfarin. *Id.* at 16-17.

77. The medical records indicate that between April 2, 2013 and September 20, 2013, Ms. Tsosy's INR values were measured at least 13 times. Her INR was therapeutic on seven of those occasions, which is more than half of the times they were measured. Her INRs were sub-therapeutic on three dates and supra-therapeutic on three dates. During each of those visits, her Warfarin dosage was adjusted accordingly. *Id.* at 16, 44.

78. Third, the experts discussed Ms. Tsosy's compliance with her Warfarin regimen. Dr. Breall testified that it is possible for a patient's INR to be sub-therapeutic because he or she did not take the anticoagulation medication, but that other issues may also be the cause, such as dietary issues or the use of antibiotics. Tr. vol. 1, 138:16. Dr. Shadoff testified that there were several factors indicating possible non-compliance with Ms. Tsosy's medication, including that when she presented to Crownpoint on October 29, 2013, her INR went from 1.44 to 1.6 after a 2 milligram dose of Warfarin. Tr. vol. 3, 58:11-15; 126:17-127:2. He also testified that there is no indication in the records that Ms. Tsosy attended her

pharmacy visit on October 21 or 22, 2013, as requested at her visit on September

20, 2013. Pl. Ex. 5 at 17. He then acknowledged that there were no records

indicating that she did not show up.[5] Tr. vol. 3, 76:10-19, 78:4-8. Furthermore,

the Audit Log confirms that a prescription was filled on this date. Pl. Ex. 18 at

11, 38.

79. Dr. Shadoff also admitted that there are many factors that can impact why INR

levels may fluctuate, and it does not necessarily have to be a compliance issue.

Tr. vol. 3, 125:9-18. Contrary to his testimony regarding his thoughts on Ms.

Tsosy's compliance issues, he conceded that there was no indication of

compliance issues anywhere in the anticoagulation clinic records. *Id*. at 77:2-24.

80. Ms. Nez testified that she helped her mother take her medications and watched

to make sure that Ms. Tsosy in fact took her medications. Tr. vol. 2, 28:8-13. An

ambulance report from October 29, 2013 also reflects that the patient's daughter

[Ms. Nez] indicated that the patient was compliant with her prescribed

medications. Pl. Ex. 5 at 124.

81. According to Dr. Breall, Dr. Nealon's consideration of Ms. Tsosy's age, fall risk,

and possible compliance issues should have been reasons to continue the

Warfarin treatment, not discontinue it. Tr. vol. 1, 144:15-18.

82. Fourth, the experts discussed the Morse Fall Scale. The Morse Fall Scale is

another assessment that Dr. Nealon considered in her decision. It is a scale used

in hospitals by doctors and nurses to assess a patient's potential to fall. *Id*. at

---

[5] There were no records produced by the United States for this date.

141:10-12.  The Crownpoint medical records indicate that a functional assessment was done of Ms. Tsosy in which she was determined to be a high fall risk on the Morse Fall Scale, and the records indicate that fall precautions were initiated.  Def. Ex. A at 196.

83. Dr. Breall testified that it seemed appropriate to use the Morse Fall Scale to avoid hospital falls, but opined that it was not appropriate to base a decision to remove a patient from anticoagulation medication based on the Morse Fall Scale. He pointed out that neither Ms. Tsosy's primary care physician nor her cardiologist had relied on that information to make a decision to remove her from Warfarin.  Tr. vol. 1, 141:22-142:5.  Furthermore, the anticoagulation clinic records are not indicative of any concern on the part of her healthcare providers, who continued to administer Warfarin between April and September.  *See* Def. Ex. A-1.  In fact, the records from September 29 note: "Patient has not fallen recently but given how the patient has experienced a fall, I counseled on trip hazards and also what could happen if the patient was to fall and hit her head." *Id*. at 16.  There is no reference to major concern of a bleed risk following Ms. Tsosy's fall.

84. The Court finds credible Dr. Breall's testimony that the Morse Fall Scale is appropriately used as a tool to assess an in-patient's fall risk in the hospital, but should not have been afforded substantial weight by Dr. Nealon in concluding that Ms. Tsosy was a high fall risk, or that a bleed risk was of principle concern.

85. Fifth, the experts discussed the requirement of shared decision making, which precludes a doctor from unilaterally making a medical decision for a patient. While the doctor can make a recommendation, the patient must agree before any action is taken. According to Dr. Breall, a treating physician must also discuss any issues with the family and ensure that they have been given all of the facts before arriving at a shared decision. Tr. vol. 1, 149:14-150:7.

86. Dr. Nealon testified that it is her standard practice to engage in shared decision-making with patients and families. *Id.* at 41:13-14. Accordingly, Ms. Nez, as Ms. Tsosy's caregiver, had to sign off on the nursing discharge instructions indicating that she understood and agreed to the decision to remove her mother from Warfarin. *Id.* at 151:15-152:2. The record indicated that Ms. Tsosy and Ms. Nez both comprehended the prescribed medications and instructions. Def. Ex. A at 207-08.

87. However, Dr. Breall testified that he did not believe that the family here had a full understanding of the implications of the discharge instructions. He stated that he does not believe that it was clear to the family that Dr. Nealon was deciding to withdraw "life-saving medication." Tr. vol. 1, 152:3-11.

88. Further, as noted above, the Court does not find credible Dr. Nealon's testimony with respect to the specifics of her interactions with Ms. Tsosy and the family. Dr. Nealon testified that she had a conversation with the family about the risks and benefits of Warfarin, and that she had a discussion in which the family related that Ms. Tsosy was having difficulty going to the bathroom alone and

that she required assistance while walking, cooking, and getting dressed. *Id*. at

228:18-24. This version of events is in direct conflict with Ms. Nez's testimony

that her mother remained active until she was hospitalized at Crownpoint in

October of 2013, including cooking for herself up until the day she was

hospitalized. Tr. vol. 2, 7:23-8:1. While Dr. Nealon testified that she recalls

medical decision-making conversations that she has with her patients, she also

admitted that she was unable to recall what Ms. Tsosy or her family members

looked like. Tr. vol. 1, 49:22-25, 48:15-49:24. She further testified that she

remembers this conversation "in review of records." *Id*. at 49:21-24. But as the

Court has noted, the records are not indicative of any discussion regarding the

stroke risk specifically. Pl. Ex. 5 at 240.

## CONCLUSIONS OF LAW

### I. Introduction

1. This claim is brought by Plaintiff Marjorie Nez, on behalf of decedent, Mary

   Tsosy, for medical negligence and wrongful death arising under the Federal Tort

   Claims Act. Ms. Nez is the daughter and was appointed personal representative

   of the Estate of Mary Tsosy. Compl. at 2, June 3, 2016, ECF No. 1.

2. This medical malpractice case arises out of the care Ms. Tsosy received by Erin

   Nealon, D.O. at Crownpoint Healthcare Facility on October 29 and 30, 2013.

   Pretrial Order at 3, May 8, 2018, ECF No. 37. Plaintiff alleges that Dr. Nealon

   fell below the standard of are by removing Ms. Tsosy from anticoagulation

   medication given her high risk for developing blood clots. *Id*.

## II.    Federal Tort Claims Act

3. This Court has jurisdiction over the subject matter and parties in this matter. 28 U.S.C. § 1346(b); 28 U.S.C. § 2671.

4. The Federal Tort Claims Act ("FTCA") is a "limited waiver of sovereign immunity, making the Federal Government liable to the same extent as a private party for certain torts by federal employees acting within the scope of their employment." *United States v. Orleans*, 425 U.S. 807, 813 (1971).

5. The FTCA allows a plaintiff to bring a civil action in district court for personal injury or death caused by the negligence or wrongful act of an employee of the government acting within the scope of her employment, "where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1).

6. An "employee of the government" includes officers or employees of any federal agency and persons acting on behalf of a federal agency in an official capacity. 28 U.S.C. § 2671. Whether that employee was acting within the course and scope of her federal employment is determined by applicable state tort law. *Williams v. United States*, 350 U.S. 857 (1955). New Mexico state law, therefore, applies to determine whether the physician, Dr. Nealon, was acting within the course and scope of her employment with the Indian Health Services during the time of the alleged negligent act.

7. Under the principle of respondeat superior, an employer is liable for an employee's torts that are committed within the course and scope of the

employee's employment.  *Spurlock v. Townes*, 368 P.3d 1213, 1216 (N.M. 2016) (quoting *Ocana v. Am. Furniture Co.*, 91 P.3d 58 (N.M. 2004); *Baer v. Regents of Univ. of California*, 884 P.2d 841, 846 (N.M. Ct. App. 1994).  Therefore, the United States would be liable for Dr. Nealon's torts if committed within the scope of her employment.

8. Under New Mexico state law, an employee's act is considered within the scope of employment if it was "fairly and naturally incidental to the employer's business assigned to the employee" and if it was "done while the employee was engaged in the employer's business with the view of furthering the employer's interest and did not arise entirely from some external, independent and personal motive on the part of the employee."  NMRA, Rule 13-407.

9. Ms. Tsosy received treatment from Dr. Nealon at Crownpoint Healthcare Facility on October 28 and 29, 2013.  *Pretrial Order* at 3.  Dr. Nealon, in treating Ms. Tsosy and recommending that she stop the use of Warfarin, was acting within the scope of her employment of Defendant, United States, as an employee of the Indian Health Service at Crownpoint Healthcare Facility.

10. In determining the government's liability, the Court must look to "the law of the place where the act or omission occurred."  *Richards v. United States*, 369 U.S. 1, 9 (1962); *see also Flynn v. United States*, 902 F.2d 1524, 1527 (10th Cir. 1990) (citing *Ewell v. United States*, 776 F.2d 246, 248 (10th Cir. 1985)).  Dr. Nealon treated Ms. Tsosy and Crownpoint Healthcare Facility, located in Crownpoint,

New Mexico.  Therefore, New Mexico substantive law applies in determining liability this case.

## III.  Negligence

11. To prevail in a medical negligence action in New Mexico, a plaintiff has the burden of proving that: (1) the defendant owed a duty recognized by law; (2) the defendant failed to conform to the recognized standard of medical practice in the community; and (3) the act or omission complained of was the proximate cause of the injuries.  *Provencio v. Wenrich*, 261 P.3d 1089, 1093 (N.M. Ct. App. 2011); *Blauwkamp v. Univ. of New Mexico Hosp.*, 836 P.2d 1249, 1252 (N.M. Ct. App. 1992).

### A. Duty

12. In New Mexico, healthcare providers and doctors owe patients a duty to "possess and apply the knowledge and to use the skill and care ordinarily used by reasonably well-qualified [doctors and health care providers] practicing under similar circumstances, giving due consideration to the locality involved."  *Alberts v. Schultz*, 975 P.2d 1279, 1284 (N.M. 1999) (citing UJI 13-1101).  A doctor's adherence to her duty is not determined by the results but rather by the "reasonableness under the circumstances at the time."  *Id.*

13. Here, Dr. Nealon had a duty to possess and apply the knowledge and to use the skill and care ordinarily used by reasonably well-qualified physicians acting under similar circumstances, giving due consideration to the locality involved.  *Id.*; UJI 13-1101.  This would require taking into consideration the standard of

care for treating patients with similar health problems in a rural area.  Tr. vol. 1, 166:1-20.

### B. Breach

14. A healthcare provider or doctor who breaches her duty of skill or care is negligent.  *Alberts*, 975 P.2d at 1284.  The New Mexico Supreme Court, in *Pharmaseal Labs., Inc. v. Goffe*, stated that while the factfinder must give due consideration to the locality involved, locality is "merely one factor for the fact-finder to consider." 568 P.2d 589, 594 (N.M. 1977); *see also* NMRA, Rule 13-1101. Evidence of the duty owed by a physician to a patient "can be provided by expert testimony of the knowledge, skill and care ordinarily used by reasonably well-qualified doctors of the same field of medicine practicing under similar circumstances, and this includes testimony from doctors from the same or other localities." *Pharmaseal Labs*, 568 P.2d at 593-94.

15. Dr. Nealon breached her duty of care to Ms. Tsosy in her decision to remove Ms. Tsosy from the anticoagulation medication without ensuring other proper anticoagulation treatment.  Prescribing a monotherapy of aspirin for protection against a stroke was below the standard of care.  Dr. Nealon testified that patients with atrial fibrillation have several high-risk factors for stroke, including her diabetes, age, hypertension, and congestive heart failure.  Tr. vol. 1, 26:8-27:5; 39:16-40:20.  She also testified that she believed Ms. Tsosy had a high risk of a bleed so she decided not to treat her with "excessive anticoagulation" when she discharged her home on aspirin but not Warfarin.

Rather, the aspirin was for ischemic protection from other cardiac diseases. *Id*. at 65:10-17. Dr. Breall testified that removing Ms. Tsosy from her anticoagulation medication based on her fall risk was below the standard of care. *Id*. at 124:3-6. He also testified that aspirin as a monotherapy for patients like Ms. Tsosy with atrial fibrillation is not effective for preventing strokes. *Id*. at 119:13-19. Dr. Nealon agreed with literature stating that aspirin as a monotherapy is not effective for preventing strokes. *Id*. at 65:5-9. Dr. Shadoff testified that during the period in 2013 when Ms. Tsosy was hospitalized at Crownpoint, she was a stroke risk due to her atrial fibrillation, hypertension, diabetes, and hyperlipidemia. Tr. vol. 3, 22:19-23:6. He agreed with Dr. Breall that, among other factors, Ms. Tsosy's atrial fibrillation created a high risk of stroke. *Id*. at 61:25-62:8. At the time Dr. Nealon removed Ms. Tsosy from her anticoagulation medication, Ms. Tsosy was a high risk for stroke. Tr. vol. 1, 116:13-21, 39:16-40:20.

16. Dr. Nealon's determination to discontinue Ms. Tsosy's anticoagulation treatment on the basis that Ms. Tsosy's INR value was sub-therapeutic was a departure from the standard of care. Dr. Breall testified that it is not acceptable to discontinue Warfarin on the basis of sub-therapeutic INR values, particularly for a patient who has been on the medication for a relatively short period of time. *Id*. at 123:24-124:2, 155:11-18. He testified that it is normal for patients who have not been using the medication for a long period of time to have INR values that drop into the sub-therapeutic range. *Id*. at 155:11-18. Instead, the

appropriate course of action would be to adjust the medication in an effort to bring the patient into the therapeutic range. *Id.* at 123:12-16; Tr. vol. 2, 65:10-21; *see also* Pl. Ex. 5 at 16, 44.

17. Dr. Nealon also fell below the standard of care with respect to her communication with Ms. Tsosy and her family. Her failure to advise Ms. Tsosy and Ms. Nez of Ms. Tsosy's specific risk of stroke if she discontinued Warfarin was below the standard of care, as was her failure to document whether she advised Ms. Tsosy and Ms. Nez of the risk of stroke if Ms. Tsosy discontinued anticoagulation therapy. The standard of care requires a shared decision with the patient and family, rather than the physician making a decision for the patient. Tr. vol. 3, 26:6-11. It is then up to the patient to determine whether to follow the recommendation or not. *Id.* at 59:24-60:6. A treating physician must discuss any issues with the family and ensure that they have been given all the facts before arriving at a shared decision. Tr. vol. 1, 149:14-150:7. However, the records only reflect a discussion of the risks versus benefits of stopping the medication, with no reference to any discussion of the risk of stroke. Pl. Ex. 5 at 240. Dr. Nealon did not document in the medical records any discussion in which she advised Ms. Tsosy to discontinue Warfarin because of a bleed risk, or any conversation regarding a high risk of stroke if she discontinued Warfarin. Tr. vol. 1, 45:8-46:9, 46:10-21; Pl. Ex. 5 at 240. Furthermore, Ms. Nez testified that Dr. Nealon spoke to her only once regarding her mother's healthcare. Tr. vol. 2, 21:6-10. As previously noted, the Court does not find credible Dr.

Nealon's testimony as to her conversations with Ms. Tsosy and her family regarding the risks and benefits of stopping Warfarin.

18. Finally, Dr. Nealon's decision to stop the anticoagulation treatment without consulting Ms. Tsosy's treating physician or prescribing cardiologist was a deviation from the standard of care. Dr. Breall testified that it would have been "prudent" to consult Ms. Tsosy's prior treating physicians. Tr. vol. 1, 128:7-15, 150:11-15. However, Dr. Nealon did not consult or attempt to consult Ms. Tsosy's primary care physician or her cardiologists before determining that it was appropriate to remove her from the medication that they had all previously ordered. *Id.* at 106:7-107:21.

19. Although Dr. Shadoff testified that Dr. Nealon's judgment regarding the risks and benefits of Warfarin was appropriate and that, according to the record, she discussed the bleeding risks with Ms. Tsosy and Ms. Nez, the medical records do not in fact reflect any discussion regarding stroke risks if the medication was discontinued. Pl. Ex. 5 at 240. Dr. Shadoff testified that the national guidelines for the standard of care would require a shared decision with the patient and family together, rather than the physician making a decision for the family. Tr. vol. 3, 26:6-11. He further testified that Dr. Nealon's failure to inform Ms. Tsosy of her high risk of stroke and high risk of bleeding would be below the standard of care. *Id.* at 115:25-116:4. The Court does not find that there is credible information that such a discussion or a shared decision took place.

### C. Causation

20. In order to prevail on a negligence claim, the plaintiff must show that the defendant's breach was a cause in fact and a proximate cause of her injury. *Herrera v. Quality Pontiac*, 73 P.3d 181, 186 (N.M. 2003). This inquiry focuses on the "extent the defendant's conduct foreseeably and substantially caused the specific injury that actually occurred." *Lujan v. New Mexico Dep't of Transp.*, 341 P.3d 1, 10 (N.M. Ct. App. 2015) (quoting *Herrera*, 134 N.M. at 48).

21. An act or omission is a proximate cause if it "contributes to bringing about the injury, if the injury would not have occurred without it, and if it is reasonably connected as a significant link to the injury." *Id.* Proximate cause contemplates that a "natural and continuous sequence [unbroken by an independent intervening cause] produces the injury," and without that sequence, the injury would not have otherwise occurred. *Alberts*, 975 P.2d at 1286 (citing UJI 13-305 NMRA 1998).

22. Proximate cause does not require that the act or omission is the only cause or nearest cause, and it is "sufficient if it occurs with some other cause acting at the same time." *Id.*

23. To establish causation in a medical negligence case, the patient must prove that the poor medical result (in this case, the wrongful death) was caused by the doctor's negligence. UJI 13-1112. Plaintiff must show by a preponderance of the evidence that the defendant's negligence resulted in the injury. *Alberts*, 975 P.2d at 1286 (specifically discussing a claim for loss of chance for a better

outcome due to medical providers' negligence, but noting that the standard for proximate cause does not change when the injury is loss of chance as opposed to the ultimate injury to the patient"); *see also Coffey v. United States*, 906 F.Supp.2d 1114, 1168 (D.N.M. 2012) (requiring a plaintiff, under New Mexico law, to prove by a preponderance of the evidence that breach was cause-in-fact and probable cause of plaintiff's damages). Therefore, the plaintiff does not have to show causation to an "absolute certainty," but instead must show that a causal link between the defendant's negligence and the injury is "supported by the weight of the evidence." *Alberts*, 975 P.2d at 1286.

24. In New Mexico, evidence establishing proximate cause in a medical negligence case must show proof to a "reasonable degree of medical probability" that the negligence caused the injury. *Id.*; *see also Lopez v. Sw. Cmty. Health Servs.*, 833 P.2d 1183 at 1187-88 (N.M. Ct. App. 1992) (court required expert testimony to reasonable degree of medical probability to prove liability against hospital in medical malpractice case). Both the preponderance of the evidence standard and the reasonable degree of medical probability standard require proof that "a causal connection is more probable than not." *Id.* at 1287.

25. Because of the complexity of the issues, medical malpractice suits generally require that "expert medical testimony [be] adduced to establish a standard of care, to assess the doctor's performance in light of the standard, and to prove causation." *Gerety v. Demers*, 589 P.2d 180, 191 (N.M. 1978). Therefore,

Plaintiff was required to present expert testimony establishing that it is more probable than not that Dr. Nealon's negligence caused Ms. Tsosy's death.

26. Plaintiff has met her burden of establishing, through the expert medical testimony of Dr. Breall, the causal link between Dr. Nealon's negligence and Ms. Tsosy's death. Dr. Breall testified that if Dr. Nealon had met the standard of care and had either continued Ms. Tsosy on Warfarin or placed her on alternative anticoagulation medication, Ms. Tsosy would have survived. Specifically, he testified that Ms. Tsosy "would not have had the stroke and more likely than not would be alive today doing her usual activities." Tr. vol. 1, 127:18-22. He further testified that he believed to a reasonable degree of medical probability that Ms. Tsosy would not have suffered an ischemic stroke and subsequently died if she had been on anticoagulation therapy. *Id.* at 170:20-25. He opined that, to a reasonable degree of medical probability, Ms. Tsosy's stroke was a direct cause of the discontinuation of Warfarin. *Id.* at 125:10-15.

### D. Conclusion

27. Plaintiff has established that Dr. Nealon owed a duty to possess and apply the knowledge and to use the skill and care ordinarily used by well-qualified physicians acting under similar circumstances. Plaintiff has also proven to a reasonable degree of medical probability that Dr. Nealon was negligent in her treatment of Ms. Tsosy. Third, Plaintiff has proven to a reasonable degree of medical certainty that Dr. Nealon's negligence was a proximate cause of the stroke that ultimately led to Ms. Tsosy's death. Therefore, Plaintiff has proven

her claim of medical negligence against the United States. The United States is liable for Dr. Nealon's negligence. *See Spurlock*, 368 P.3d at 1216.

## IV.  Other Issues of Liability

### A. Adverse Inference

28. Plaintiff requests that the Court make an adverse inference with respect to Defendant's failure to produce anticoagulation clinic visit records from October 22, 2013. Pl.'s. Req.'d Findings and Conclusions, ¶¶ 13, 14. The general rule under a spoliation of evidence theory is that "bad faith destruction of a document relevant to proof of an issue at trial gives rise to an inference that production of the document would have been unfavorable to the party responsible for its destruction." *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1407 (10th Cir. 1997). However, if a party seeks a finding of an adverse inference, that party also has the burden of proving bad faith on the part of the party who is unable to produce the record. *Turner v. Pub. Serv. Co. of Colo.*, 563 F.3d 1136, 1149 (10th Cir. 2009). The *Turner* court held that sanctions for spoliation of evidence are not proper where there is no showing of bad faith. *Id.* Negligence in losing or destroying records is not sufficient without bad faith because it "does not support an inference of consciousness of a weak case." *Aramburu*, 112 F.3d at 1407.

29. Plaintiff argues that records from Ms. Tsosy's October 22, 2013 visit to the anticoagulation clinic would show that she was both stable on her Warfarin and compliant with her medications. Pl.'s Req'd Findings and Conclusions, ¶ 14, Aug. 24, 2018, ECF No. 78. Accordingly, based on Defendant's failure to produce

these records, Plaintiff requests that the Court draw the inference that, if the records had been produced, they would have contained information unfavorable to the defense.  Tr. vol. 3, 130:7-16.

30. In *Aramburu*, the court held that the plaintiff was not entitled to an adverse inference because: (1) he did not point to evidence showing that the defendant lost the records in dispute in bad faith; and (2) such an inference of bad faith was undermined by the defendant's production of other attendance records.  112 F.3d at 1407.  Likewise here, Plaintiff has not presented evidence of bad faith on the part of the United States in its failure to produce the October 22, 2013 clinic records, particularly given that Defendant did produce records from other dates.  *See generally* Tr. vol. 3, 76-78.  Furthermore, Defense counsel stated that he attempted to obtain medical records for this date, but that Crownpoint was unable to locate them.  *Id*. at 131:1-5.  At trial, Defense counsel represented that it did not intentionally withhold records, and the Court found that representation to be credible.  *Id*. at 133:2-5.  Therefore, as Plaintiff has not made a showing of bad faith, the Court will not make an adverse inference with respect to Defendant's failure to produce the subject records.  The Court does, however, note that the Audit Log produced by Plaintiff reflects that a prescription was filled on the date in question, October 22, 2013, which indicates that Ms. Tsosy was compliant with her medications.  Pl. Ex. 18 at 11, 38.

## B. Comparative Fault

31. Defendant asks the Court to apply a theory of comparative fault under New Mexico law, arguing that the Court should consider the comparative negligence of the Defendant as well as providers from Rehoboth McKinley Christian Hospital and/or Rehoboth McKinley Christian Hospital itself. Def.'s Req.'d Findings of Fact and Conclusions of Law, ¶ 30, Sept. 21, 2018, ECF No. 81. Under New Mexico's comparative negligence scheme, if the Court determines that the injury was caused by a combination of the negligence of multiple parties, it must determine the amount of damages attributable to each liable party, with the sum of the percentages assigned to each party equaling 100. NMRA, Civ. UJI 13-2219; *Richter v. Presbyterian Healthcare Serv.*, 326 P.3d 50, 65 (N.M. Ct. App. 1998).

32. A defendant has the burden of persuasion in making a showing of comparative negligence. *Jaramillo v. Kellogg*, 966 P.2d 792, 794 (N.M. Ct. App. 1998) (citing *Tafoya v. Seay Bros. Corp.*, 890 P.2d 803, 805 (N.M. 1995)) ("party alleging an affirmative defense has the burden of persuasion"). Meeting this burden would require expert testimony that the nonparties in this case, namely, Rehoboth and its providers, breached their duty of care. *Id.* The *Jaramillo* court held that "general statements alluding to comparative negligence do not merit a jury instruction on the theory." *Id.* (citation omitted). Defendant failed to present any specific expert testimony as to the negligence of Rehoboth and its providers that would provide the court with relative percentages of fault. *Id.*

33. Accordingly, Defendant has not met its burden of establishing that Rehoboth Hospital or its providers is also liable. Therefore, Defendant United States will be responsible for the full sum of the damages.

## V. Damages

34. Plaintiff is seeking all damages available to Ms. Tsosy's Estate under the Wrongful Death Act, in addition to loss of consortium of her mother. Pretrial Order at 4, May 8, 2018, ECF No. 37. Specifically, Plaintiff seeks damages for the pain and suffering experienced by Ms. Tsosy between October 29, 2013 and her death on November 8, 2013, the loss of value of Ms. Tsosy's life, and the damages for funeral and burial expenses. Pl.'s. Req'd Findings and Conclusions, ¶¶ 19, 20.

35. Under the FTCA, damages are determined in accordance with the law of the state in which the tort was committed. *Hatahley v. United States*, 351 U.S. 173 (1956) (citing 28 U.S.C. § 1346(b)). Under New Mexico law, the aggregate dollar amount recoverable by a plaintiff for any injury or death to a patient resulting from malpractice shall not exceed $600,000. NMSA 1978, § 41-5-6. New Mexico's $600,000 recovery cap applies to the finding of liability against the United States in this case. *Haceesa v. United States*, 309 F.3d 722, 729-30 (10th Cir. 2002) (holding that the Government's liability under the FTCA is limited to that of a private employer under like circumstances).

36. Punitive damages are not available in tort claims against the United States. 28 U.S.C.A. § 2674.

## A. Wrongful Death

37. A plaintiff in a New Mexico wrongful death action may recover for the value of life of the decedent, as well as for any medical and hospital expenses incurred by the decedent prior to her death. *Hall v. Regents of Univ. of New Mexico*, 740 P.2d 1151, 1152 (N.M. 1987) (citing *Stang v. Hertz Corp.*, 467 P.2d 14 (N.M. 1970)(*Stang II*)).

38. The purpose of the Wrongful Death Act is both to compensate the statutory beneficiaries of the decedent and to deter negligent conduct. *Romero v. Byers*, 427 872 P.2d 840, 845 (N.M. 1994) (citing *Stang v. Hertz Corp.*, 463 P.2d 45, 58 (N.M. Ct. App. 1969)(*Stang I*)).

39. Under the Wrongful Death Act, the presence or absence of pecuniary damages or measurable monetary loss to the beneficiaries is a factor that should be considered. *Romero*, 117 N.M. at 427, 872 P.2d at 846. However, substantial damages may be recovered even without proof of pecuniary loss. NMSA 1978, § 41-2-1. *Stang II*, 81 N.M. at 351, 467 P.2d at 17; *see also Gutierrez v. Kent Nowlin Const. Co.*, 658 P.2d 1121, 1127 (N.M. Ct. App. 1981), *rev'd on other grounds*, 658 P.2d 1116 (N.M. 1982). The Supreme Court of New Mexico has clarified that "proof of pecuniary injury is not a prerequisite to recovery of damages for wrongful death." *Romero*, 117 N.M. at 428 (citing *Stang I*, 463 P.2d at 48).

40. Factors to be considered in determining the monetary value of the decedent's life include age, earning capacity, health, habits, and life expectancy. *Romero*, 872

P.2d at 846 (citing SCRA 13-1830).  New Mexico law also allows damages to be awarded for pain and suffering experienced between the time of injury and death, the value of life apart from earning capacity, and emotional distress to familial caretakers caused by loss of society, guidance, and companionship. NMRA, Civ. UJI 13-1830.

41. The Supreme Court of New Mexico has held that the Wrongful Death Act "encompasses all damages that are fair and just." *Romero*, 872 P.2d at 846.  The Tenth Circuit also affirmed a decision awarding damages under New Mexico law based on pain and suffering and loss of enjoyment of life, including "activities of daily living," "social leisure activities," and "internal well-being." *Smith v. Ingersoll-Rand Co.*, 214 F.3d 1235, 1245 (10th Cir. 2000).  In that case, the Tenth Circuit upheld an award by this Court that included "nonquantifiable damages" for "pain and suffering" and "loss of enjoyment of life." *Id*. at 1252. The jury's award of seven million dollars in "nonquantifiable" compensatory damages was based on evidence of physical and emotional pain, enjoyment of life activities, and changes in family relationships.  *Id*.

42. In the instant case, the Court has considered all of these pecuniary and non-pecuniary factors in determining an award of damages that is fair and just. First, with respect to pain and suffering, Ms. Tsosy suffered physically after she was removed from the Warfarin prior to her death.  She reported a headache and chest pain.  Tr. vol. 2, 46:25-47:5.  Previously, when being treated by Dr. Nava, she did not report chest pain.  *Id*. at 63:2-8.

43. Furthermore, Ms. Nez related that something "looked off" with her mother when she brought her to the emergency room. *Id.* at 15:3-16:1. Once in the hospital, after Ms. Tsosy suffered her stroke, she was unable to speak or even open her eyes. *Id.* at 23:8-24:13.

44. Next, Ms. Tsosy enjoyed her life up until her hospitalization in October of 2013. She enjoyed cooking, including making corn mush and tortillas, going for walks with her family and on her own, playing with and feeding her animals, sewing her own clothes, weaving with other women, and traveling. *Id.* at 7:12-22, 8:23-9:6, 9:12-19, 11:15-21, 11:22-12:7, 111:3-12. She traveled out of state to visit family, including to Phoenix where she also enjoyed attending the flea market. *Id.* at 11:22-12:7, 32:2-25, 113:17-114:21. Ms. Tsosy was still traveling the year prior to her death. *Id.* at 29:1-3. Plaintiff presented family photographs depicting a family trip to Phoenix in 2013. Pl. Ex. 10; Tr. vol. 2, 25:11-26:6, 31:22-32:6. She remained active and did chores, including sweeping the house, washing dishes, and making her bed. Ms. Nez testified that her mother did not like to "sit around and do nothing," and that she was "always up doing something." *Id.* at 11:4-12. In Mr. Nez's testimony, he described Ms. Tsosy as healthy and "always happy." *Id.* at 111:1.

45. Ms. Nez also testified to the close relationship she had with her mother, sleeping in the same room where they each had a bed, talking until they fell asleep. *Id.* at 13:20-25. Mr. Nez similarly testified to the close relationship that he witnessed between Ms. Nez and her mother, describing how Ms. Nez took care of

Ms. Tsosy and took Ms. Tsosy everywhere with her. He also confirmed that Ms. Nez and Ms. Tsosy slept in the same room. *Id*. at 114:25-115:4.

46. For evidence of life expectancy, Plaintiff provided a National Vital Statistics Report for the life expectancy of females in the United States in 2013. Pl. Ex. 21. Based on Ms. Tsosy's age of 87 at the time of her death, according to this chart she had a 0.093753 probability of dying between age 87 and age 88, and had a six year expectation of life at that time. *Id*.

47. Plaintiff also presented documentation of medical bills in the amount of $16,728.73 from Rehoboth, and other bills totaling $696.59.[6] She presented documentation of the funeral and burial expenses of $3,046.56. Pl. Ex. 11. Ms. Nez testified that funeral and burial expenses came out to over $6,000, and that they received funds from the Navajo tribe as well as family donations. Tr. vol. 2, 24:17-25:10. However, no other documentation of the funeral or burial expenses were provided.

48. Based on Ms. Tsosy's pain and suffering, the active lifestyle she led up until October of 2013, the ways in which she contributed to household tasks, her projected life expectancy, and the close relationship she shared with her daughter and family, the Court finds that Plaintiff is entitled to the full amount of damages under New Mexico law in the amount of $600,000 for the wrongful death of Ms. Tsosy.

---

[6] These bills appear to have been covered by Medicare. Pl. Ex. 19.

## B. Loss of Consortium

49. A loss of consortium claim was first recognized in New Mexico by *Romero v. Byers*, 872 P.2d 840 (N.M. 1994), where the Supreme Court of New Mexico held that a loss of consortium claim is to be brought separately from a wrongful death claim. *Id.* at 842. The *Romero* court defined loss of consortium as "the emotional distress suffered by one [spouse] who loses the normal company of his or her mate when the mate is physically injured due to the tortious conduct of another." *Id.* at 843. Loss of consortium claims, which are based on "relational" interests rather than legal interests, have since been extended to non-spousal relationships. *Lozoya v. Sanchez*, 66 P.3d 948, 955 (N.M. 2003), *abrogated on other grounds by Health v. La Marina Apartments*, 180 P.3d 664 (N.M. 2008).

50. In *Lyoza*, the Supreme Court of New Mexico explicitly held that a claim for loss of consortium was permissible outside the realm of a marital relationship. *Id.* at 951 (permitting an unmarried co-habitant to bring a loss of consortium claim for the loss of her partner); *see also Fernandez v. Walgreen Hastings Co.*, 968 P.2d 774, 784 (N.M. 1998) (allowing grandparent who was the familial caretaker and "provider of parental affection" to recover for loss of consortium for death of a minor grandchild); *State Farm Mutual Auto. Ins. Co. v. Luebbers*, 119 P.3d 169, 179 (N.M. Ct. App. 2005) (holding that minor child may bring a claim for loss of consortium upon death of a parent); *but see Wachocki v. Bernalillo County Sheriff's Dept.*, 228 P.3d 504, 518-19 (N.M. Ct. App. 2010) (finding that, based on

facts before it, relationship between decedent and his adult brother did not rise to the level of sufficient "relational interest" for a loss of consortium award).

51. While a loss of consortium claim based on a relationship between an adult child and a parent has not been recognized in New Mexico, the New Mexico courts have declined to "foreclose, as a matter of law" the possibility of recovery for different types of relationships other than those already recognized. *Wachocki*, 228 P.3d at 518.

52. There is a two-prong test to determine if damages for loss of consortium are warranted. *Holley v. Evangelical Lutheran Good Samaritan Society*, No. 12-CV-0320(KBM/WDS), 2012 WL 12902722, at *2 (D.N.M. June 8, 2012). The first prong requires proving a "sufficiently close relationship." *Id.*; *see also Grano v. Weese*, No. 17-CV-0287(SMV/KK), 2017 WL 3051952, at *4 (D.N.M. June 27, 2017). The second prong requires proving that there was a duty of care owed by the defendant to the claimant where it was foreseeable that the injury would harm the relationship. *Id.* (citing *Wachocki v. Bernalillo County Sheriff's Dept.*, 265 P.3d 701, 703 (N.M. 2011)).

53. With regard to the first prong, the factors to be considered in determining whether the relationship was sufficiently close include:

> the duration of the relationship, the degree of mutual dependence, the extent of common contributions to a life together, the extent and quality of shared experience, and … whether the plaintiff and the injured person were members of the same household, their emotional reliance on each other, the particulars of their day to day relationship, and the manner in which they related to each other in attending to life's mundane requirements.

*Lozoya*, 66 P.3d at 957 (citation omitted). Of these factors, "mutual dependence is the key factor." *Holley*, 2012 WL 12902722 at 2. In turn, mutual dependence includes emotional, physical, and financial support, turning on a relationship that is "intimate, protective, interdependent, and intertwined in functional…, financially interdependent, and temporal ways." *Fitzjerrel v. City of Gallup ex rel. Gallup Police* Dep't, 79 P.3d 836, 840 (N.M. Ct. App. 2003). The burden is on the claimant to prove a "close familial relationship with the victim." *Lozoya*, 66 P.3d at 957 (citing *Fernandez*, 968 P.2d 774).

54. Here, in support of her loss of consortium claim, Plaintiff posits that Ms. Nez was Ms. Tsosy's familial caretaker for the last ten years of Ms. Tsosy's life, and that they enjoyed a close mother-daughter relationship. Pl.'s. Req.'d Findings and Conclusions, ¶ 21; Tr. vol. 2, 26:19-24. During Ms. Nez's testimony at trial, she described their close familial relationship. She discussed how they were affectionate with one another, and how Ms. Tsosy not only lived in her home but also shared a room with her, where they would lie on their beds and talk until they fell asleep. Tr. vol. 2, 13:20-25. Ms. Nez helped her mother stay current with her medication regimen, transported her to medical appointments, assisted her with bathing, and helped with other hygiene-related activities like cleaning her dentures and applying eye drops. *Id*. at 8:7-19, 13:20-23, 27:3-16, 28:14-24.

55. The evidence, however, makes clear that Ms. Tsosy was still quite active and, in many ways, independent up until the time of her death. She walked the dog, played with and fed her animals, cleaned, washed dishes, made her bed, sewed

her own clothes, and cooked for herself. *Id*. at 7:10-8:7, 11:9-21. Ms. Nez testified that her mother cooked for herself up until the time she was admitted to Crownpoint in October of 2013, stating that the last day before she went to the hospital "was only one day that she didn't cook for herself." *Id*. at 7:23-8:1.

56. Ms. Tsosy's independence distinguishes this case from *Fernandez*, where a grandparent familial caretaker was able to recover for loss of consortium based on the death of a minor grandchild. Without question, Ms. Tsosy exhibited a level of independence that exceeded the capabilities of the twenty-two-month-old child in that case. Analyzing the *Fernandez* decision, the *Wachocki* court noted that a small child "depends almost entirely on her primary caregiver to provide for her needs," and on the other hand, the caregiver is "largely consumed by the responsibility;" the obligation to the child is thus a "defining component" of the caretaker's life. *Wachocki*, 228 P.3d at 519. Applying similar reasoning to its own facts, the *Wachocki* court found that two adult brothers sharing an apartment for several months and splitting bills did not rise to the level of "mutual dependence [or] common contributions to a life together," as contemplated by the court in *Lozoya*. 66 P.3d 948. In *Lozoya*, the court relied on the fact that the claimant and decedent had been together for 30 years, shared a home for 15 years, had three children together, shared the same last name, filed joint tax returns, and held themselves out as a married couple, as well as testimony as to the mutual dependence in their daily lives. 66 P.3d at 952, 958.

57. Based on evidence presented by the Plaintiff, Ms. Tsosy appears to have depended on Ms. Nez only for support with a concrete number of isolated activities. Although Ms. Nez cared for her mother for many years prior to Ms. Tsosy's death, was paid by Ambercare, and Ms. Tsosy may not have been able to live on her own, Plaintiff did not present evidence that Ms. Nez's life was consumed by the care that she provided her mother. Plaintiff also failed to provide evidence as to Ms. Nez and Ms. Tsosy's "mutual dependence on each other in their day to day lives." *Id*. As the court found in *Wachocki*, Plaintiff here has not proven either the mutual dependence, or the sufficiently close relationship necessary to satisfy the first prong of the loss of consortium test.

58. Because Plaintiff failed to meet the first prong of the loss of consortium test, the Court declines to reach the second prong.

59. The Court does not find this relationship to be sufficiently mutually dependent to warrant damages based on loss of consortium.

## CONCLUSION

The foregoing reasons compel the Court to enter judgment in favor of the Plaintiff, Marjorie Nez, in the amount of $600,000.00.

Dated this 13th day of February, 2019.

_____
**MARTHA VÁZQUEZ**
UNITED STATES DISTRICT JUDGE

Felicia C. Weingartner
**Law Offices of Felicia C. Weingartner**
Albuquerque, New Mexico
***Attorney for Plaintiff Nez***

Cid Lopez
**Law Office of Cid D Lopez**
Albuquerque, New Mexico
***Attorney for Plaintiff Nez***

Roberto D. Ortega
**United States Attorney's Office**
Albuquerque, New Mexico
***Attorney for Defendants***

Brandon Fyffe
**United States Attorney's Office**
Albuquerque, New Mexico
***Attorney for Defendant***